**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**BETTY G. NABORS,**

      **Plaintiff,**

**vs.**                                    **Case No. 4:14cv437-MW/CAS**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

      **Defendant.**

_____/

## REPORT AND RECOMMENDATION

      This is a Social Security case referred to the undersigned magistrate judge for a report and recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.2(D).   It is now before the Court pursuant to 42 U.S.C. § 405(g) for review of the final determination of the Acting Commissioner (Commissioner) of the Social Security Administration (SSA) denying Plaintiff's applications for a period of disability and Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI).   After careful consideration of the entire record, it is respectfully recommended that the decision of the Commissioner be reversed and this case remanded to the Commissioner.

**I.  Procedural History**

      On October 4, 2010, Plaintiff, Betty G. Nabors, filed an application for a period of disability and DIB.   R. 18, 48-55, 112-46.   (Citations to the record shall be by the

symbol "R." followed by a page number that appears in the lower right corner.)   On

December 15, 2010, Plaintiff filed an application for SSI.   *Id.*   In both applications,

Plaintiff alleged disability beginning August 31, 2009, claiming chronic migraines, mood

and sleep disorder, depression, left-hand numbness, blurred vision of the right eye

during migraine, severe pain, and arthritis.   R. 167, 176-77, 183.

      Plaintiff was 45 years old at the time of the Administrative Law Judge's (ALJ)

decision.   R. 48, 178.   She completed college and became a licensed Certified Public

Accountant (CPA).   R. 168.   She worked as an accounting manager and CPA until

August 31, 2009, when she states she quit work due to her condition.   R. 168-69, 183,

207.   Plaintiff's date last insured, or the date by which her disability must have

commenced for DIB eligibility only, was December 31, 2014.   R. 18, 179.

      Plaintiff's claims were denied initially on March 11, 2011, and upon

reconsideration on May 20, 2011.   R. 18, 48-61, 64-69.   On July 13, 2011, Plaintiff, by

her counsel, requested a hearing.[1]   R. 70.   On August 20, 2012, ALJ Frederick

McGrath held a video hearing situated in Atlanta, Georgia, and Plaintiff attended the

hearing in Tallahassee, Florida, with her representative, James Kole, an attorney.

R. 18, 36-37.

      On November 1, 2012, the ALJ entered his decision concluding that Plaintiff is

not disabled.   R. 18-29.   On November 13, 2012, Plaintiff requested review of the

ALJ's decision and submitted a brief (R. 264-65, Exhibit 19E) and additional evidence

---

[1]   On March 28, 2011, Plaintiff retained the law firm of Proctor and Kole.   R. 62.
On March 29, 2011, the SSA appointed James A. Kole and/or Maureen C. Proctor to
represent her.   R. 63.

(R. 1178-80, Exhibit 31F).   R. 13.   On May 23, 2014, the Appeals Council denied

Plaintiff's request for review and noted that it had reviewed Exhibit 31F, a "new medical

source opinion" "submitted from Victoria Smith, M.D., dated November 14, 2012," R. 5.

R. 4-9.   The Appeals Council stated, in part:

> The [ALJ] decided your case through October 4, 2012.   Dr. Smith's medical
> source opinion relates to the period at issue as well as about a later time.   We
> found Dr. Smith's medical source opinion that is within the period of issue does
> not provide a basis for changing the [ALJ's] decision.   We also found Dr. Smith's
> medical source opinion about a later time does not affect the decision about
> whether you were disabled beginning on or before October 4, 2012.

R. 5.   Plaintiff was told that if she wanted the SSA to consider whether she was

disabled after October 4, 2012, she would need to apply again.   *Id.*   On August 13,

2014, the Appeals Council granted Plaintiff's request for more time to file a civil action.

R. 1-2.   The ALJ's decision stands as the final decision of the Commissioner.

20 C.F.R. § 404.981.

On August 17, 2014, Plaintiff filed a Complaint requesting judicial review of the

Commissioner's final decision.   Doc. 1.   Both parties filed memoranda of law, docs. 16

and 17, which have been considered.

## II.  Findings of the ALJ

The ALJ made several findings relative to the issues raised in this appeal:

1.   "The claimant meets the insured status requirements of the Social Security
Act through December 31, 2014."   R. 20.

2.   "The claimant has not engaged in substantial gainful activity since August 31,
2009, the alleged onset date."   *Id.*

3.   "The claimant has the following severe impairment: migraine headaches."
*Id.*   The ALJ considered several of Plaintiff's "medically determinable
impairments," including but not limited to "mood disorder, anxiety disorder, not

otherwise specified, bipolar disorder, and post-traumatic stress disorder [PTSD]" finding they were 'non-severe'" and determined that "even when considered in combination with other medically determinable impairments discussed in this decision – they have had minimal (if any) limiting effects on the claimant's function."   R. 21.   The ALJ also determined that Plaintiff's "symptoms have improved when compliant with conservative treatment and the record does not support any significant functional limitations resulting from the aforementioned non-severe impairments."   *Id.*

4.   "The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."   R. 21.   The ALJ applied the psychiatric review technique (PRT) to assess the severity of Plaintiff's mental impairments and, after discussing some of the evidence, determined that Plaintiff had *mild* restrictions in activities of daily living; *mild* difficulties in maintaining social functioning; *mild* difficulties in maintaining concentration, persistence or pace; and *no* episodes of decompensation of extended duration.   R. 22-24; *see* 20 C.F.R. § 404.1520a.[2]   PRT findings are used to evaluate whether a claimant suffers from a severe mental impairment at step two or meets or equals a listing at step three.   *Id.*; *see* Social Security Ruling (SSR) 96-8p (July 2, 1996).

5.   "[T]he claimant has the residual functional capacity [RFC] to perform the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b)." R. 24.   At step four, the ALJ considered the conclusion of Disability Determination Services upon reconsideration, R. 28, 217-220, and the overall evidence and found that Plaintiff is able to perform the physical and mental demands of her previous work as an accountant as actually performed.   R. 21-28, 218.   In the alternative, the ALJ found that based on Plaintiff's age (younger individual), education, work experience and RFC, that there are other jobs that exist in significant numbers in the national economy that Plaintiff also can perform.   R. 28.   In part, "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b).

6.   "The claimant has not been under a disability, as defined in the Social Security Act, from August 31, 2009, through the date of this decision."   R. 28.

---

[2]   The relevant DIB and SSI regulations are virtually identical.   As a result, citations will be made to the DIB regulations found at 20 C.F.R. §§ 404.1500-404.1599, unless a SSI regulation provides otherwise.   The parallel regulations are found at 20 C.F.R. §§ 416.900-416.999, corresponding to the last two digits of the DIB citations, *e.g.*, 20 C.F.R. § 404.1563(c) corresponds to 20 C.F.R. § 416.963(c).

III.  **Legal Standards Guiding Judicial Review**

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. 42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial evidence is more than a scintilla, but less than a preponderance.   It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."   Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).   "The Commissioner's factual findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).   Plaintiff bears the burden of proving that she is disabled, and consequently, is responsible for producing evidence in support of her claim.   See 20 C.F.R. § 404.1512(a); Moore v. Barnhart, 405 F.3d at 1211.

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."   42 U.S.C. § 423(d)(2)(A).   A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. § 423(d)(1)(A); see 20 C.F.R. § 404.1509 (duration requirement).

Both the "impairment" and the "inability" must be expected to last not less than 12

months.   Barnhart v. Walton, 535 U.S. 212 (2002).   In addition, an individual is entitled

to DIB if she is under a disability prior to the expiration of her insured status.   *See* 42

U.S.C. § 423(a)(1)(A); Moore v. Barnhart, 405 F.3d at 1211; Torres v. Sec'y of Health &

Human Servs., 845 F.2d 1136, 1137-38 (1st Cir. 1988); Cruz Rivera v. Sec'y of Health

& Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).   42 U.S.C. § 423(d)(1)(A)

> quite clearly requires that it is the impairment only which must last for a
> continuous period.   Normally, of course, when a claimant has an impairment
> severe enough to prevent him from working, he will be unable to work for
> as long as the impairment lasts.   This is particularly true when the impairment
> is physical.   The statute, however, does not *require* that a claimant be unable to
> engage in work during the entire 12 month period.   *See also* 20 C.F.R. §§
> 404.1505(a); 404.1509; 404.1510.   The ability of a claimant to engage in work
> for limited periods of time certainly calls into question the severity of the
> impairment, but it does not necessarily determine whether the impairment,
> however, severe, has lasted for at least 12 months.

> While a claimant need only show that an alleged impairment has lasted or
> can be expected to last for the 12 month period to meet the duration
> requirement, a claimant alleging a mental impairment may face a difficulty not
> presented in cases involving physical impairment.   As one court has stated,

>> While the mere existence of symptom-free periods may negate a
>> finding of disability when a physical impairment is alleged, symptom-free
>> intervals do not necessarily compel such a finding when a mental
>> disorder is the basis of the claim.   Unlike a physical impairment,
>> it is extremely difficult to predict the course of mental illness.
>> Symptom-free intervals, though sometimes indicative of a remission
>> in the mental disorder, are generally of uncertain duration and marked
>> by an impending possibility of relapse.   Realistically, a person with a
>> mental impairment may be unable to engage in competitive employment,
>> as his ability to work may be sporadically interrupted by unforeseeable
>> mental setbacks.

> *Lebus v. Harris*, 526 F. Supp. 56, 61 (N.D. Cal. 1981).

> Because of such considerations, the courts which have considered the question
> have concluded that a claimant whose claim is based on a mental condition does

not have to show a 12 month period of impairment unmarred by any symptom-free interval. . . .   We agree with the assessment of these courts.   A finding that a claimant has a mental impairment which manifests itself from time to time over a long-term period is not inconsistent with the language of the statute, which requires that an impairment last "for a continuous period of 12 months.". . .   Of course, as required by the regulations, the claimant must present medical evidence which indicates that his mental condition is a long-term problem and not just a temporary setback.

Singletary v. Bowen, 798 F.2d 818, 821-22 (5th Cir. 1986) (citations omitted).

See Lane v. Astrue, No. 1:09-cv-00159-MP-AK, 2010 U.S. Dist. LEXIS 75846, at *28-30 (N.D. Fla. July 28, 2010) (citing Singletary) ("While the Eleventh Circuit Court of Appeals has not decided this precise issue, other courts that have considered the durational requirement for a mental impairment and have determined that a plaintiff need not show 12 months of impairment without any periods of remission."   (citations omitted)); see also Peterson v. Comm'r of Soc. Sec., Case No. 6:10-cv-1817-Orl-31KRS, 2012 U.S. Dist. LEXIS 20577, at *27-28 (M.D. Fla. Jan. 31, 2012), adopted, 2012 U.S. Dist. LEXIS 20726 (M.D. Fla. Feb. 17, 2012).

The Commissioner analyzes a claim in five steps.   20 C.F.R. § 404.1520(a)(4)(i)-(v):

1.   Is the individual currently engaged in substantial gainful activity?

2.   Does the individual have any severe impairments?

3.   Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4.   Does the individual have the residual functional capacity (RFC) to perform work despite limitations and are there any impairments which prevent past relevant work?[3]

---

[3]   An RFC is the most a claimant can still do despite limitations.   20 C.F.R.

> 5.   Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.   A positive finding at step three results in approval of the application for benefits.   At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.

Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work.   If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled.   If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience.   Phillips v. Barnhart, 357 F.3d 1232, 1237 (11th Cir. 2004); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 404.1520(a)(4)(v), (e) & (g).   If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the

---

§ 404.1545(a)(1).   It is an assessment based upon all of the relevant evidence including the claimant's description of her limitations, observations by treating and examining physicians or other persons, and medical records.   *Id.*   The responsibility for determining claimant's RFC lies with the ALJ.   20 C.F.R. § 404.1546(c); *see* Social Security Ruling (SSR) 96-5p, 1996 SSR LEXIS 2, at *12 (July 2, 1996) ("The term "*residual functional capacity assessment*" describes an adjudicator's finding about the ability of an individual to perform work-related activities.   The assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence.").

Commissioner.   Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

## IV.  Evidence

### A.  Evidence Before the ALJ

Plaintiff had a long history of treatment for her migraines and daily headaches

prior to her alleged onset date.   In 2001, Plaintiff received treatment for "migraine

cephalgia with chronic headache syndrome" with Richard R. Cunningham, D.O.

R. 304-06.

Neurologist S. James Shafer, M.D. provided treatment for Plaintiff's headaches in

2002-03.   *See, e.g.*, R. 268-69, 287-88.   On January 21, 2003, Dr. Shafer noted that,

"it is very difficult to treat her headaches and that we have some degree of risk while

taking medications which may have untoward or unknown side-effects.   The patient

agreed to continue with medication.   Her headaches are very disabling and are

beginning to create a great deal of emotional and physical distress."   R. 402.   Her

medications included Imitrex, Phenergan, Depakote, Calan; she discontinued Baclofen.

She was in the second trimester of pregnancy.   A neurological examination indicated

Plaintiff was "alert and pleasant.   She is mildly distressed because of ongoing

headache pain.   Otherwise she is appropriate.   Cranial nerves are stable.   No focal

weakness.   Gait is normal."   *Id.*   By June 23, 2003, Dr. Shafer noted that Plaintiff had

refractory migraine" but was "headache-free since having her baby"; she had no

complaints; and she was told she may use Imitrex as necessary.   R. 284.

Plaintiff experienced a short remission from the June 2003 birth of her child until her October 2006 hysterectomy.   In 2006 and 2007, Plaintiff received treatment for headaches from neurologist, J. Lucas Koberda, M.D., Ph.D.

It appears Plaintiff's first visit with Dr. Koberda was on November 15, 2006. R. 294-96.   Plaintiff reported "a longstanding history of headaches since [her] adulthood."   R. 294.   She "had no problems until a hysterectomy" in October "due to endometriosis."   *Id.*   She started having headaches again "which responded partially to medications" and placed on Topamax and Tenormin.   She noted that Stadol spray and Fioricet worked for breakthrough headaches.   *Id.*   Radiology reports (MRI/MRA) of her brain were unremarkable.   *Id.*; *see* R. 313-14.   Plaintiff's mental and neurological examinations had normal results.   R. 295.   Dr. Koberda's impressions were: "Patient presents with exacerbation of migrainous headaches most likely due to hormonal changes after her hysterectomy."   R. 296.

On November 30, 2006, Plaintiff returned for a follow-up for headaches with Dr. Koberda.   R. 279.   Plaintiff reported she did better after raising the dose of Topamax, but her headaches "started all over."   *Id.*   Plaintiff was "interested in different modalities of treatment" and was "asking about Botox injections." Dr. Koberda's impression was that Plaintiff "has exacerbation of headaches."   *Id.*   He recommended that Plaintiff increase Topamax twice a day and scheduled Plaintiff for steroid, trigger-point injection to relax muscles.   *Id.*; *see* R. 277-78 (Dec. 5, 2006, follow-up visit).   By December 11, 2006, Plaintiff had "excellent control of migraine after Botox injection."   R. 277.   Plaintiff was to gradually taper off Topamax and Celexa and

continue amitriptyline and return in four to six weeks.   *Id*.   Plaintiff returned on January
29, 2007, and had a beneficial response to Botox; she did not like Amitriptyline and was
switched to Cymbalta.   Dr. Koberda noted, "[w]hen she gets the headaches so severe,
she becomes suicidal."   Dr. Koberda noted that he would ask Plaintiff's insurance
carrier to approve payment for Botox for headaches.   Plaintiff received Botox samples.
R. 276; *see* R. 275 (letter).   By February 28, 2007, Plaintiff reported that Cymbalta
gave her "partial improvement" of her headaches, but still having major headaches.
R. 271.   Plaintiff had normal speech and comprehension; good strength in extremities
and normal gait.   *Id*.   As of March 14, 2007, Dr. Koberda's impression was that Plaintiff
"has been doing well."   He gave Plaintiff more Cymbalta samples for headache
prevention.   R. 270.

By this time, Plaintiff had already been prescribed multiple medications for her
headaches, including Elavil, Ambien, Axert, Fioricet, Depakote, Prozac, Calan,
Phenergan, Imitrex, Stadol, Tenormin, Lexapro/Celexa, amitriptyline, Topamax,
Cymbalta, intravenous SoluMedrol, Medrol, Inderal, Maxalt, Naprelan, and underwent
Botox injections.   R. 266-69, 270-74, 277-78, 285, 287-88, 298, 395-402.

In February 2008, Dr. Koberda noted that Plaintiff experienced, on the average,
eight migraines a month, but could experience up to 15 migraines a month during the
winter.   He sent Plaintiff for an experimental study.   R. 377-79, 381.   From February
28 to March 2, 2008, Plaintiff received inpatient treatment at the Johns Hopkins Bayview
Medical Center due to "status migrainosus," but experienced a severe anaphylactoid
reaction to the DHE (dihydroergotamine) treatment.   Once emergency intervention

ceased and she was medically stable, she had improved dramatically, but with a return of migraine.   R. 319-20, 342-43, 346.   Her mental, cranial nerves, and motor examinations were normal.   *See* R. 332.   Plaintiff was discharged with a diagnosis of "refractory migraine" with instructions to never receive DHE treatment, and with a prescription for an intravenous "migraine cocktail" including SoluMedrol, Ranitidine, and Toradol.   R. 342.   Plaintiff was to continue on Cymbalta at an increased dose and Ambien at bedtime for her depression/anxiety.   *Id.*   Returning home, in March 2008, Plaintiff saw Victoria L. Smith, M.D., at Patients First to fill a prescription for the migraine cocktail, but it had to be administered in an emergency room.   R. 531-32.

On March 19, 2008, Plaintiff saw neurologist Stephen E. Nadeau, M.D., of Shands at UF Clinic, for the first time.   R. 373-76.   Dr. Nadeau recorded a patient history, reviewed several medical records, examined Plaintiff, and rendered his impression that Plaintiff was "status migrainosus occurring in the context of weekly very prolonged migraines superimposed on a background of chronic daily headache and neck pain."   R. 374.   He changed Plaintiff's medications to include Lorazepam at bedtime, OxyContin up to 100 mg daily, Toradol (Stadol), injectable Imitrex, and Phenergan, with instructions to continue prednisone until her current headache improved.   Fioricet was also prescribed for minor headaches.   *Id.*   Dr. Nadeau told Plaintiff to "continue aggressive treatment of the status [migrainosus] until she was fully free and clear of headache."   He also advised Plaintiff that "mild drug-associated lethargy was acceptable[.]"   R. 375.

By April 11, 2008, Dr. Nadeau opined that Plaintiff's status migrainosus had ended, but she "has developed so-called transformed migraine, that is chronic daily headache with superimposed migrainous flares[,]" which was consistent with his clinical experience with status migrainosus cases.   Plaintiff's medications were changed to management with OxyContin/Oxycodone throughout the day, with use of Imitrex with the onset of migrainous flares.   R. 371.

Also in April 2008, Plaintiff was evaluated by pain management specialist George J. Arcos, D.O., at the Pain Institute of North Florida in Tallahassee, Florida.   He agreed with Dr. Nadeau's treatment recommendations.   R. 1069-72.   Dr. Arcos performed a physical examination of Plaintiff (with generally normal findings), including a psychological examination, which indicated Plaintiff's judgment and insight were normal; Plaintiff was oriented to time, place, and person; there was no evidence for depression, anxiety, agitation, suicidal ideation or plan.   R. 1071.

In June 2008, Dr. Nadeau noted that Plaintiff was "doing pretty well," but experienced a "full-blown migraine" with additional migrainous flares with aura once or twice weekly, despite the aggressive medication regimen, but she had still "dramatically improved."   R. 369.   Plaintiff's out-of-pocket costs for medication (OxyContin) were $1,400 a month.   R. 369, 372.   By September 2008, Dr. Nadeau noted that with the decline in control of headache followed a "marked increase in depression and anxiety and even some suicidal ideation without plans."   He also noted a "[f]luctuation in the intensity and severity of migraine is the rule rather than the exception."   R. 367.

This pattern of daily headaches with migrainous flares, at times responsive to abortive medications and at times not, continued from November 2008 through June 2009.   R. 359-66, 476-81.   In June 2009, Dr. Nadeau noted that Plaintiff recently experienced a 12-day period of status migrainosus, including severe disorientation. R. 359.   Her dosage of daily narcotic medication was increased for a "maximally aggressive approach to migrainous flares" in addition to the abortive cocktail upon onset of a flare.   R. 360.

On September 17, 2009, Dr. Nadeau noted that Plaintiff was "somewhat better with respect to control of headache when [he] last saw her but is so plagued by fatigue and lassitude that there has been a net decline in her functional level.   She is sleeping day and night."   R. 438.   She continued to have a headache 24 hours a day and had migrainous flares five to six times weekly despite medications.[4]   Plaintiff admitted "to some modest depression but relates this mainly to lack of motivation.   She says that she can still enjoy things in life."   *Id.*   Dr. Nadeau thought that perhaps Plaintiff had "atypical manifestations of depression, not withstanding [sic] the fairly aggressive antidepressant regimen that [Plaintiff] is currently taking.   [He] tend[ed] to rule out this possibility because [Plaintiff] appeared relatively cheerful in clinic today, not withstanding [sic] her enormous problems, and because she denies anhedonia.

---

[4]   Plaintiff's medications included: Fioricet (headache), Reglan and Phenergan (nausea), Temazepam and Trazodone (sleep), Wellbutrin and Lexapro (depression), OxyContin 240 mg daily, MS Contin (morphine) 120 mg daily, Toradol 30 mg injection for migrainous flare, Stadol opioid nasal spray "for rescue when all other drugs fail," and an additional oxycodone up to 210 mg daily for breakthrough pain on migrainous flare. Imitrex was also an alternate to the Toradol injections.   R. 438.

Nevertheless, [he] cannot absolutely rule out depression."   R. 439.   In addition to the migrainous flares, she awoke daily around 3 a.m. with a third type of headache, but this could be controlled with medications.   In addition, Toradol was the more effective medication for the acute episodes, but she was unable to self-administer the medication and had to wait until her husband was available to help her.   She also used Stadol as a "last resort because it made her feel so druggy."   R. 438-39.   Dr. Nadeau noted, "[g]iven the extraordinary severity of her migraine problem, I think we have arrived, at least for the time being, at a generally satisfactory approach.   However, she is substantially disabled by lassitude."   R. 439.   Dr. Nadeau explained at length that lassitude could be a migraine symptom, or possibly an atypical manifestation of depression despite the "fairly aggressive antidepressant regiment" currently prescribed, or related to a sleep disorder.   R. 439.   Dr. Nadeau noted that he discussed the possibility of applying for disability with Plaintiff and her husband.   He stated he would support Plaintiff in whatever decision she made, and "[t]here is no question that she has a devastating problem and I also understand that they are under great financial stress."   R. 439-40.   Dr. Nadeau recommended a sleep study.   R. 439.

An October 15, 2009, polysomnography identified sleep fragmentation, severe hypersomnolence due to possible medication effect, and abnormal sleep architecture with the absence of stage III and IV sleep.   The concurrent EEG study showed alpha intrusions, consistent with a history of chronic pain.   AutoPAP treatment and nocturnal pain management were recommended.   R. 436, 441-42.

On December 17, 2009, Dr. Nadeau noted that Plaintiff's condition was the same with slightly worse headache control.   She continued to "sleep night and day and is up only a total of four to five hours during the day" for 45 minutes at a time.   He described her routine:

> She continues in her chronic daily headache pattern.   After taking her morning medications, headache drops to 4-5[/10] level.   Headache then gradually builds but the second dose of OxyContin and MS Contin drops the headache to 4 to 5 again.   Unfortunately this does not last through the remainder of the day so that evenings are often bad and furthermore, she experiences superimposed migrainous flares.

R. 436.   Dr. Nadeau opined that it was "quite possible that her daytime lethargy is related to migraine," and that a migrainous flare can cause some patients to be "plagued by incapacitating fatigue and sleepiness."   R. 437.   Ritalin was prescribed, and Dr. Nadeau also suggested a "draconian" migraine diet.   He noted that Plaintiff "has an extraordinarily severe migraine problem and we are certainly pushing the envelope in trying to deal with it with pharmacologic therapy."   R. 437.

By March 11, 2010, Plaintiff returned to Dr. Nadeau for migraine headaches, sleep disorder, and depression.   R. 430.   There had been "some deterioration in [Plaintiff's] situation."   *Id*.   Her headache pattern had not changed, but the severity of episodes had increased.   She was using Imitrex injections for acute episodes eight times a month, Toradol at least once a day, 180 Fioricet tablets in less than 20 days, unable to tolerate the migraine diet, having to "push herself hard to get out of bed," and reporting increased depression.   *Id*.   Dr. Nadeau noted that Plaintiff's "situation certainly poses some major problems, not least because so many things are going on, and it is not perfectly clear what is contributing to what."   "Her chronic fatigue is

certainly a plausible manifestation of migraine," but depression may be an issue.   *Id.*

He also noted that it was

> possible that her migraine disorder has further evolved, making it more refractory
> to the treatment that she is on.   However, in situations like this one always has
> to wonder what mix of migraine pain and suffering of psychiatric origin is being
> treated.   The reportedly dramatic response to Fioricet is simply not plausible,
> even as she is seriously over using that drug to the point of raising concerns
> about hepatotoxicity from Tylenol.   Although I have not had a lot of luck with the
> migraine diet I gave her last time, I am concerned that she really did not even
> give it a decent trial.

R. 430-31.   Lamotrigine was prescribed for depression and mood stabilization, and

Plaintiff was instructed to taper off Fioricet due to concerns about overuse and toxicity.

Instead, she was instructed to continue using a combination of OxyContin, MS Contin,

and oxycodone with Stadol for refractory headache.   R. 431.

On April 8, 2010, Dr. Nadeau was still concerned about Fioricet and NSAID

overuse, and noted that neither additional medication would be likely to significantly

improve her headaches, "given the headache severity and the magnitude of the doses

of the opiate she is taking to treat it."   R. 419.   Dr. Nadeau noted that Plaintiff "is

clearly still struggling pretty severely with depression and in clinic exhibited

hyperventilation, reflecting an enormous amount of anxiety…all quite understandable

under the circumstances given the severity and refractoriness of her headache

syndrome and depression as well as her anxieties" about discontinuing Fioricet and

NSAIDs.   Dr. Nadeau noted Plaintiff's new left hand symptoms, opining they may be

related to functional disease, "though more in the sense that migraine is a functional

disorder than in the sense that these symptoms might be a direct result of psychiatric

problems."   R. 420.   Dr. Nadeau performed a general and neurologic physical

examination of Plaintiff with generally normal results except for positional vertigo and some issues related to her left hand, although she "exhibited completely normal strength throughout and most particularly, in all muscle groups in the left hand and in the lower extremities."   *Id.*

An April 20, 2010, cervical MRI identified a new osteophyte and disc complex at C5-8, which mildly indented the spinal cord.   R. 424-26.   A brain MRI was normal. R. 423.   On April 21, 2010, Dr. Smith administered the migraine cocktail of Phenergan, Toradol, and Decadron as recommended by Shands.   R. 582.

By May 20, 2010, Dr. Nadeau noted that Plaintiff accomplished a "dramatic turnaround in the control she is exerting over her life and with it a major improvement in sleep and depression" with the help of the new medication Nuvigil and complete discontinuation of Fioricet.   "She thinks this has helped her daytime sleepiness.   She reports a lot of energy and major improvement in her depression.   She is sleeping better, apparently because she is more active during the day, and therefore more fatigued when she goes to bed."   R. 413.   She still planned on pursuing disability with only an "incremental improvement" of her headaches and was still "spending two or three days a week in bed with headache."   OxyContin and MS Contin were still being used to control headaches.   R. 413-14.

In a June 10, 2010, letter to Plaintiff's insurance company requesting coverage for Nuvigil, Dr. Nadeau explained:

> As a migraine expert, I can tell you that I routinely see many of the worst conceivable migraine disorders and in this unfortunate group of patients, Ms. Nabors has one of the most severe disorders I have encountered. Achieving adequate treatment of her constant headache with frequent

migrainous flares has posed a major challenge.   Her migraine, as in many patients, is associated with profound lassitude and sleepiness.   Daytime sleepiness is further aggravated by the doses of drugs that must be used to achieve an acceptable level of analgesia.   My goal right along has been to alleviate Ms. Nabors' suffering and to enable her to be at least somewhat functional during the daytime.   In this context, the recent introduction of Nuvigil 150 mg q.a.m. has achieved results boarding [sic] on miraculous.   She has experienced a dramatic improvement in daytime wakefulness and energy level, and this in turn has had a very salutary effect on her depression, which in the past has been severe and refractory to treatment.   For all of these reasons, I ask that you re-consider your decision to deny what has been a life-saving treatment for this patient.

R. 406.   Coverage for Nuvigil was declined, however.   R. 408-12, 415.   Plaintiff received treatment for an infection in June and July 2010 after a Toradol injection was done incorrectly.   R. 482-87.

On August 12, 2010, Dr. Nadeau noted that Plaintiff was "doing reasonably well under the circumstances, although she continues to struggle in many respects.   She is sleeping well.   She has her ups and downs with depression, but these are tied to migrainous flares and generally she is doing fairly well.   She continues to do considerably better with respect to daytime fatigue and hypersomnolence using the Nuvigil, which she is having to pay for" because her insurance company would not cover this drug. R. 404.   Her headache control was worse, with Plaintiff using Toradol daily in addition to the MS Contin and Oxycodone.   *Id.*   In light of recent changes to Shands' policy, Plaintiff "signed an agreement for opioid maintenance therapy and she will be subject to random urine drug screens during future clinic visits."   *Id.*

By October 28, 2010, Dr. Nadeau noted that Plaintiff was generally sleeping well, but was interrupted up to three to four times weekly by a headache in the early morning hours.   R. 489.   Nuvigil helped Plaintiff remain functional and cognitively intact, albeit

with a two-hour afternoon nap daily, but Plaintiff's depression had worsened with severe anxiety; she denied suicidal thoughts.   *Id.*   In addition, she continued to have "severe headaches 24/7 that is further punctuated by daily migrainous flares."   R. 489-90.   In addition to the preventative narcotic mediations, she was using Toradol injections two or more times a day, and Imitrex about four times a month.   Olanzapine and counseling were prescribed for anxiety, and Plaintiff was told to limit Toradol use to once a day. *Id.*   Plaintiff also received treatment with Dr. Smith of Patients First, during 2010, for general care and urgent "migraine cocktail" treatments.   R. 447-71.

On January 20, 2011, Olanzapine was discontinued due to an allergic reaction. Plaintiff's sleep quality had declined, but was able to maintain "fairly good" daytime wakefulness with Nuvigil and a two-hour nap daily.   Although she was "reasonably functional and cognitively intact during the day but has only 2-3 hours when she is able to be productive."   R. 600, 736.   The frequency and severity of headaches had not changed significantly, and Plaintiff experienced status migrainous through most of December.   *Id.*   Depression remained a "major problem, not significantly changed from last visit.   She is not getting counseling."   *Id.*   Lamotrigine was prescribed as a mood stabilizer and counseling for depression was recommended.   R. 601, 737.

On February 14, 2011, Plaintiff was evaluated by psychologist Michael G. Railey, Sr., Ph.D., at the Commissioner's request.   R. 559-61 (Mar. 7, 2011, report). Dr. Railey noted that he relied on a clinical interview with Plaintiff; a mini-mental state examination; office visit notes of Dr. Smith; and a medication list developed by Plaintiff.[5]

---

[5]   Dr. Nadeau, not Dr. Smith, primarily treated Plaintiff for depression in

R. 559.   Plaintiff stated that she could perform activities of daily living, unless she was

having a migraine episode, which disrupted her ability to have a normal productive life.

R. 560-61.   As part of the mental status examination, Plaintiff "verbalized no complaints

regarding sleep, appetite, and bathroom habits."   R. 560.   Plaintiff's "chief complaint

was of having problems with migraine headaches and their disruptive impact on her

ability to lead a normal productive [ ].   Secondary to the headaches she feels hopeless

and also becomes anxious."   R. 561.   Dr. Railey diagnosed mood disorder due to

migraine headaches and anxiety disorder, not otherwise specified (NOS).   He opined

that Plaintiff was "clinically stable in spite of her depressive episodes; there is no mental

health or related impediments to gainful employment.   *Id*.; *see infra* at 33-34.

On March 8, 2011, Dr. Smith administered a "cocktail" of migraine abortive

medications, including Phenergan, Toradol, and Decadron.   R. 567.[6]

On April 17, 2011, Dr. Nadeau noted Plaintiff's medications included Reglan and

Phenergan for nausea; Temazepam, Trazodone and Mirapex for sleep; Nuvigil,

Wellbutrin and Lexapro for depression; OxyContin, MS Contin, and oxycodone for

headache control; Toradol and occasional Imitrex subcutaneously for migrainous flares;

and lamotrigine for mood stabilization.   She remained "reasonable functional and

---

conjunction with her migraine headaches.

[6]   On March 11, 2011, Catharina Eeltink, Ph.D., a non-examining medical source completed a Psychiatric Review Technique (PRT).   R. 711-24; *see infra* at 34.   On March 11, 2011, Serena Collins, a single decision maker, completed a Physical RFC Assessment.   R. 725-32; *see infra* at 33-34.   On May 18, 2011, Gary W. Buffone, Ph.D., ABPP, a non-examining medical source, also completed a PRT.   R. 783-96; *see infra* at 34.   On May 19, 2011, Thomas Renny, D.O., a non-examining medical source "affirmed as written" Ms. Collins' March 11, 2011, assessment.   R. 797; *see infra* at 34-35.

cognitively intact during the day but has only 2-3 hours when she is able to be productive and this varies substantially from day to day.   She may have good days of fairly high productivity and then bad days when she is bed bound much of the day. R. 739.   Dr. Nadeau again noted "[i]t seems likely that daytime anesthesia is related to her migraine."   *Id.*   Although Plaintiff's depression had improved substantially, her headache severity had increased.   She reported experiencing very brief, less than 15-minute, a new type of "extremely intense headaches characterized by sudden severe focal pain accompanied by bright light in one eye," and occurring four to five times a month.   *Id.*   Dr. Nadeau took this report to represent a form of "icepick headache."   *Id.*

On April 18, 2011, Dr. Nadeau provided a "To Whom It May Concern" letter summarizing Plaintiff's history of migraines and treatment.   R. 741-42, 748.   He explained that, despite "fairly successful" treatment to "alleviate suffering" caused by Plaintiff's chronic daily headache (24/7) with frequent migraine flares, Plaintiff has "continued to have headache and incapacitating migraine associated asthenia (extreme fatigue)."   He estimated that Plaintiff was "largely bed bound as a result of these symptoms approximately 15 days a month," and if attempting to work, would have two or three un-scheduled absences a week.   Dr. Nadeau opined that Plaintiff "clearly presents with an extraordinarily challenging problem and I do not expect any revolutionary improvements in her migraine situation for the foreseeable future.   Her problem with the headache is further complicated by major depressive disorder that has also been quite difficult to treat, and a complex sleep disorder."   R. 748.   Dr. Nadeau opined that since February 3, 2008, Plaintiff "has been 100% disabled by these

problems and that insofar as can be determined at the present time, this disability is permanent." *Id.*

On June 23, 2011, Dr. Nadeau noted in a letter to Dr. Smith that Plaintiff's sleep was improved, but she was not significantly productive despite being awake and her headaches were the same.   R. 811.   Plaintiff's depression had improved substantially, and she was receiving counseling.[7]   Her restless limb symptomology was no longer an issue.   *Id.*   The Lamotrigine dosage was increased.   She appeared in better spirits. R. 811-12.

On June 28, 2011, Dr. Nadeau opined in a Mental RFC Checklist that Plaintiff would have an extreme limitation in performing at production levels in a work environment; moderate limitations in the ability to maintain attention and concentration for brief periods and tolerate customary work pressures; and none to mild limitations in other areas of social interaction, sustained concentration or persistence, and adaption. R. 806-07.   He opined that her condition would deteriorate under the stress of a job, with the increase of anxiety and depressive symptoms.   R. 807.   Dr. Nadeau also opined that Plaintiff's affective disorder met the criteria for Listing 12.04 since March 11, 2008, due to the continuous management of migraine headache, depression, and sleep disorder.   R. 809-10.

---

[7]   On June 10, 2011, Keith Ivey, MSW, LMHC, CEAP, SAP, opined that Plaintiff had bipolar disorder, PTSD, and a chronic pain disorder.   A full psychiatric evaluation and counseling were recommended.   R. 799-804.   As of June 10, 2011, Plaintiff's GAF score was 45.   R. 804; *see infra* at n.9.   Plaintiff received counseling with Mr. Ivey until August 24, 2011.   The treatment notes are in handwriting and difficult to read. R. 1053-67.

On September 15, 2011, Dr. Nadeau noted that Plaintiff had run out of her opiate medication after using extra doses, and refused to give her additional medication. R. 962.   Plaintiff "had emailed [him] several times requesting additional medication even though it appeared she should have enough to last through her clinic appointment. Ultimately, however, as [he] learned in a phone conversation with her 3 days before her clinic visit, this was not the case, and she had run completely out of medication.   [He] viewed this as a serious lapse of responsibility on her part.   [S]aid as much, and refused to bridge her."   *Id*.   Dr. Nadeau noted that "prior to this recent disaster," Plaintiff had been doing reasonably well.   She had been sleeping well and keeping more regular sleep hours.   Her depression had improved with weekly counseling, but she was having to lie down during the day when she had a migrainous flare.   The headaches had not changed in pattern or severity, and despite this she was "managing to engage in some productive activity every day."   In the three days she was out of the opiate medication, however, her headaches were "severe and unrelenting."   *Id.*   "She has had some nervousness and appeared somewhat jittery in clinic today, but was not in overt withdrawal, no surprise given her regimen."   *Id.*

On December 22, 2011, Dr. Nadeau noted that Plaintiff was again taking the opiates at the prescribed dosage, and her nausea medication was changed to avoid side-effects.   Plaintiff was doing much better with her depression, but no longer getting counseling.[8]   She had generally been sleeping well but not keeping very regular sleep

---

[8]   At step two, the ALJ noted that "in December 2011, Victoria Smith, M.D., a treating physician, indicated that the claimant was doing better with respect to her depression and was no longer getting counseling (Exhibit 24F)."   R. 21.   This

hours.   She continued having "a chronic daily headache pattern (headache 24/7) punctuated by daily migrainous flares."   No changes were made to her medical regimen other than trying to phase her over from Reglan to Ondansetron.   R. 965.

On November 9, 2011, Dr. Smith noted that Plaintiff had decided to wean herself off pain medications on her own, against Dr. Nadeau's advice.   R. 850.   On December 2, 2011, Plaintiff saw Dr. Smith for urgent treatment of a 12-day migraine with a "migraine cocktail" of Toradol, Phenergan, and Decadron while in the process of weaning off pain medications.   R. 854.

On January 7, 2012, pain management physician Robert N. Burns, M.D., M.P.H., at Meridian Clinic, administered trigger-point muscle injections for myofascial pain syndrome with lumbar spine pain.   R. 946.   Bilateral greater occipital nerve blocks were also administered due to prolonged symptoms of headache unrelieved by high dose narcotic medication or physical therapy.   R. 947.

On January 20, 2012, Plaintiff was voluntarily admitted to Tallahassee Memorial Hospital Recovery Center (Center) because she had been taking opiates prescribed by

---

statement is derived from a letter from Dr. Nadeau to Dr. Smith dated December 22, 2011.   R. 965.   In a November 14, 2012, post-ALJ decision letter to Plaintiff's counsel, Dr. Smith opined that Plaintiff

> was absolutely unable to engage in any scheduled work activity or even perform regular activities of daily living from 2008 to 2012 due to adverse side effects of consuming large doses of opiates.   Since discontinuation of those medications, [Plaintiff's] condition, as it relates to migraine severity and frequency, has remained constant or even worsened.   In turn, it remains my opinion that [Plaintiff's] condition would preclude her from performing even part-time employment.

R. 1180.

Dr. Nadeau, but "her family feels that she has not been herself and that she has missed

out on her children's lives."   R. 935.   Her chief compliant was "worsening depression

and needing to wean off medication."   *Id.*   Plaintiff stopped taking the medications

(opiates) a week prior, and as a result "felt like she wanted to die."   Plaintiff reported

feeling "depressed, is fearful of losing her marri[age], feeling hopeless and helpless."

*Id.*   Plaintiff was diagnosed with depressive disorder, NOS, and opiate dependence and

withdrawal.   She was assigned a Global Functioning Assessment (GAF) score of 40.[9]

R. 936.   Under Plaintiff's mental status examination, it is noted:

---

[9]   The American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) (4th Ed. Text Revision 2000) includes the GAF Scale that is primarily used by mental health practitioners.   The GAF Scale is used to report "the clinician's judgment of the individual's overall level of functioning" (with regard to only psychological, social, and occupational functioning) and "may be particularly useful in tracking the clinical progress of individuals in global terms, using a single measure." *See* DSM-IV-TR 32-34.   The GAF scale is divided into 10 ranges of functioning, each with a 10-point range in the GAF scale.   *Id.*   *See* Nichols v. Astrue, Case No. 3:11cv409/LC/CJK, 2012 U.S. Dist. LEXIS 119347, at *26-29 (N.D. Fla. Aug. 7, 2012) (discussing the GAF scale).   A GAF scale rating of 31-40 is indicative of some impairment in realty testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.   DSM-IV-TR at 34.   A GAF scale rating of 41-50 is indicative of serious symptoms or any serious impairment in social, occupational or school functioning.   *Id.*   A GAF scale rating of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.   *Id.*   A GAF scale rating of 61 to 70 indicates some *mild* symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.   *Id.*   The "Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' and has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorders listings.'"   Wind v. Barnhart, 133 F. App'x 684, 692 n.5 (11th Cir. 2005) (unpublished) (citing 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)).   In the Fifth Edition of the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) (2013), "[i]t was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable

> The patient is in no apparent distress.   She has fair grooming and hygiene.
> She is a female appearing older than her stated age it appears to be in significant
> distress secondary to her opiate withdrawal.   Her speech is terse and initially
> she is irritable.   She denies that she has the disease of addiction; however later
> after discussing her history she states that she is currently struggling and has
> been abusing her medications.   Her mood is irritable.   Affect is congruent.
> Thought processes as linear, logical and goal directed.   Thought content shows
> no suicidal ideation or homicidal ideation intent or plan.   No auditory or visual
> hallucinations are noted.   No delusions are noted.   Her insight and judgment
> are deemed to be fair.

R. 936.   Plaintiff's mental status examination discharge notes are brief, yet similar.

R. 934.   Plaintiff was discharged home to her husband and children.   *Id.*   Plaintiff's

GAF score was 60.   R. 933; *see supra* at n.9.   It is also noted that Plaintiff will follow

up with Dr. Ferraro, her physician at the Center, and "will also start with the intensive

outpatient substance abuse treatment program tonight to learn more about the disease

and how she can be more functional."   *Id.*   (The ALJ considered Plaintiff GAF scores

and gave them "little weight."   R. 26.)

On January 30, 2012, Plaintiff saw Dr. Smith after release from the Center.

R. 862.   Plaintiff was not taking any narcotic medication, Benzodiazepine, or

Suboxone.   Plaintiff reported "doing remarkably well."   *Id.*   Dr. Smith noted Plaintiff's

new incremental migraine treatment protocol, instructing Plaintiff to start with NSAIDs or

Excedrin Migraine, then Toradol or injectable Imitrex with a nausea medication, then if

she still did not have good control of her migraine, go to a "TCPA" intravenous infusion

suite for their migraine protocol.   She was also provided with injectable Toradol for

emergency weekend use only.   R. 864.   Plaintiff refused to go to any outpatient

---

psychometrics in routine practice.   In order to provide a global measure of disability, the
WHO DSM-5 (see the chapter "Assessment Measures")."   DSM-5 at 16.

rehabilitation center and did "not feel that she is or ever was a drug addict."   Her

husband would not let Plaintiff have two prescriptions for an opiate and "highly

encouraged to return these rx's to the prescribing MD, Der. [sic] Nadu [sic] in

Gainesville."   Plaintiff was to have a follow-up visit with Dr. Nadeau, "but she refuses to

go."   R. 862.

On February 4, 2012, Dr. Burns administered bilateral greater occipital nerve

blocks due to prolonged symptoms of headache, which were unrelieved by very high

dose narcotic medication and NSAIDs.   Dr. Burns recommended Botox treatment for

the migraines, and Plaintiff noted that she wanted to "remain off of narcotic medications

due to her traumatic experience with detox."   R. 943.

On February 16, 2012, Dr. Smith wrote to Plaintiff's insurer in an attempt to

obtain authorization for coverage of a different treatment plan.   R. 949-52.   Dr. Smith

noted Plaintiff's diagnoses of chronic daily transformed migraine for the past four years,

involving chronic daily headache (24/7) with daily migrainous flares, chronic back pain,

sleep disorder, depression, and anxiety.   R. 949.   Dr. Smith summarized recent

events, and explained that Plaintiff was concerned about the long-term opiates

prescribed by Dr. Nadeau.   She noted that "Dr. Nadeau does not recommend, nor does

he approve of her discontinuation of the medicinal regimen he prescribes on her behalf.

Consequently, under my close observation, [Plaintiff] voluntarily discontinued use of all

medication [prescribed by Dr. Nadeau] in January 2012."   R. 950.   Due the physical

dependency on the long-term narcotics, Plaintiff experienced extreme stress on her

nervous system, was first admitted to a detoxification facility, and then hospitalized on

an emergent basis.   After being stabilized, she was sent to TMH Behavioral Health

Services for continued detoxification with Suboxone.   *Id.*

Although Plaintiff was scheduled to return to Dr. Nadeau in March 2012,

Dr. Smith was seeking approval for an out-of-network provider, such as Dr. Burns.

Dr. Smith noted,

> if no other successful treatment options are available to her (and covered by her
> insurance plan with CHP), the daily chronic pain, which she is again experiencing
> since detoxing last month, is severe enough to warrant her return to Shands [and
> Dr. Nadeau] and begin the opiate regimen again, although it is not her
> preference.   Given that [Plaintiff] has already unsuccessfully undergone many
> common and uncommon treatments/therapies for migraine pain and back pain, I
> believe it is my responsibility as her Primary Care Physician to recommend
> alternative treatments in lieu of the necessity to use the opiates listed above for
> chronic pain relief.

R. 950; *see* R. 952.

On February 17, 2012, Dr. Burns again administered occipital nerve Botox

injections due to chronic migraine headache.   R. 953.   On February 24, 2012, Plaintiff

informed Dr. Burns that her migraine headaches were now occurring in a different

location, over the right eye and right temple rather than over the occipital scalp.   Botox

was injected in the new location of the bilateral temples.   R. 954.   A February 26,

2012, cervical spine MRI noted that Plaintiff's cervical degenerative disc disease was

stable, with minor disc bulging from C3 to C7 and only borderline stenosis at C5-6 and

C8-7 and no evidence of direct neural impingement.   R. 883.

On March 1, 2012, Dr. Burns administered bilateral cervical nerve blocks at C2-

C3 due to intractable migraine headache.   They were ineffective, however, and Plaintiff

reported that "headache pain prior to and after the procedure remained a 10/10."

R. 955.   The following day, Plaintiff told Dr. Burns that she was "frustrated" due to her

migraine headaches returning after the Botox injections and not decreasing in intensity.

Furthermore, Plaintiff's insurer refused to approve coverage for treatment with

Dr. Burns.   Dr. Burns prescribed Fioricet that had provided some relief in the past and

"neuropathic cream."   R. 956.   A check-off physical examination note at Meridian Clinic

that follows in the record indicates normal neurological and psychological examinations,

although Plaintiff was tearful.   R. 959.

On March 8, 2012, Plaintiff returned to Dr. Nadeau, who noted that Plaintiff was

no longer taking the opiates he prescribed.   Although she was no longer receiving

counseling, she was doing fairly well with respect to depression and "sleeping fairly

well."   R. 974.   He noted that Plaintiff's headache pattern remained the same.

Regarding the chronic daily headache:

> [s]he is chasing it with a lot of NSAIDs but these are not helpful.   Because of this
> chronic headache, it is hard for her to tell whether migrainous flares have a
> discrete onset, or whether they simply evolve as a build-up of the chronic daily
> headache.   She treats the flares with an Imitrex injection when she has it.
> Some days it is quite effective, others not.   She thinks that PO Imitrex 100 mg is
> not effective, and she gets only 9 tabs a month.   Toradol is not effective when
> used alone.   Stadol is beneficial.   Chronic neck pain continues to be a
> significant problem.   She underwent Botox injections at considerable cost but
> with no benefit.

R. 974.   Dr. Nadeau found it notable that "she stopped her narcotics because of an

ultimatum by her husband."   Plaintiff stated that the narcotics were "making her more

sedated than she thought" and reported feeling "more clear-minded and better able to

function" with less irritability.   R. 975.

Dr. Nadeau opined that Plaintiff's pain was "insuperably wrapped up in her depression" and that depression was an "enormous amplifier of suffering."   Dr. Nadeau noted that Plaintiff "has been able to meet her husband's ultimatum and is both enjoying a sense of triumph over her own courage and success and a resultant respite from her depression, with a resultant marked decrease in her level of suffering."   Although Dr. Nadeau thought this was "wonderful," he was concerned about the stability of her situation, and considered Plaintiff to be "quite fragile."   He recommended she return to counseling with an expert cognitive behavioral therapist.   R. 975.

Plaintiff inquired regarding returning to the use of Fioricet for the treatment of her chronic daily headache, as Dr. Burns had recently prescribed.   Dr. Nadeau considered this a "big mistake given her past record of psychological dependence on this drug," and further opined that, "it would be a mistake to prescribe Stadol under these circumstances" because it is a "very short acting drug and I would worry a great deal that she would end up using many doses a day to chase migraine pain."   Instead, Dr. Nadeau prescribed Imitrex (oral and subcutaneous) with additional prescriptions for possible alternates of less expensive Midrin and Cafergot.   He also provided prescriptions of the long-acting narcotic medications, an abortive narcotic mediation for flares only, and HS Temazepam for neck pain.   He opined that he had "little to offer for the chronic daily headache."   He hoped the suffering due to the chronic daily headache would remain "tolerable" as long as her depression and neck pain were controlled.   He gave Plaintiff three prescriptions for Oxycodone 30 MG 60 tablets, two fillable at a later date.   R. 975.

On April 12, 2012, Plaintiff returned to Dr. Arcos for head and neck pain.   Her

treatments with Botox and occipital nerve blocks had not provided sustained relief, and

she continued to experience headaches with photosensitivity, photophobia, nausea, and

blurred vision.   R. 979.   Dr. Arcos diagnosed migraine headaches by history, right

lesser occipital neuralgia, right auriculotemporal neuralgia, rule out right temporal

arthritis, degenerative disc disease at C3-7, and advanced myofascial pain syndrome:

cervical and thoracic.   R. 981.   On April 19, 2012, Dr. Arcos administered an epidural

steroid injection at C5-6.   R. 1118.   On May 31, 2012, Dr. Arcos administered an

epidural steroid injection at C7-T1.   R. 1147.

A May 4, 2012, EMG/NCV study was deemed abnormal with evidence of mild

chronic left C8 radiculopathy.   R. 822.   On May 18, 2012, Plaintiff was evaluated by

rheumatologist Pooja N. Patel, M.D.   Upon examination, 12/18 fibromyalgia tender

points were noted with less tender control points, in addition to bilateral knee crepitus,

left trochanteric bursitis, bilateral knee.   R. 1166.   She noted that Dr. Arcos was

prescribing Tramadol in addition to pain treatment procedures.   Dr. Patel diagnosed

"degenerative arthritis and myalgia typer [sic] symptoms."   *Id*.   She did not think

Plaintiff had Rheumatoid Arthritis.   *Id*.   Dr. Arcos administered bilateral knee injections

for pain.   *Id*.

On July 17, 2012, neurosurgeon Albert S. Lee, M.D., examined Plaintiff for the

first time at the request of Dr. Arcos and noted left pinky and ring finger abduction

weakness and atrophy; however, he opined neither the EMG/NCV nor MRI studies

identified any pathology that would benefit from surgery.   Her psychological

examination notes indicated that Plaintiff denied "sense of great danger, anxiety, mental

problems, depression, and none."   A general physical examination revealed, in part,

that Plaintiff's mood was appropriate for the setting; head and neck examination was

unremarkable; and her active cervical range of motion was within normal limits.

R. 892-94, 1048-50; *see* R. 21.

### B.  State Agency Examining and Non-Examining Consultants

At step three (Finding 4) of the sequential evaluation process, the ALJ

considered, among other evidence, reports from several State Agency consultants.

R. 22-24.   The ALJ also considered their reports when he assessed Plaintiff's RFC

(Finding 5).   R. 24-27.   The ALJ's summary of these reports, which was interspersed

among other findings, is included below.

> In February 2011, the claimant presented to a consultative examination at the
> office of Michael G. Railey, Sr., Ph.D., and subjectively reported experiencing
> severe headaches (Exhibits 7F [R. 559-61-Mar. 7, 2011]; 8F [R. 562-64-same]).
> Although Dr. Railey diagnosed the claimant with mood disorder due to migraine
> headaches and anxiety disorder, not otherwise specified, he noted that the
> claimant is clinically stable and otherwise indicated that the claimant has no
> mental health and/or related impediments to sustaining gainful employment
> (Exhibits 7F; 8F).   Dr. Railey also indicated, as detailed in Finding 4 [step three,
> R. 21-24], that the claimant was able to correctly recite three of three immediate
> recall items on the first trial, was able to correctly recite the first and third of the
> same three words after a short delay, was able to complete the five iterations of
> the "Series 7's" exercise, and was able to place the five letters of the "DLROW"
> exercise (Exhibits 7F; 8F).   The undersigned notes that the claimant did not
> endorse limitations regarding sleep, appetite, and/or bathroom habits at her
> February 2011 consultative examination (Exhibits 7F; 8F).   Dr. Railey's findings
> are consistent with the record and support a finding of "not disabled."
> Accordingly, the undersigned affords his assessment significant weight. [*See
> supra* at 20-21]
>
> * * * *
>
> State agency medical consultant Catharina Eeltink, Ph.D., is a non-examining,
> acceptable medical source and her opinions generally do not carry the same

weight as examining or treating physicians (Exhibit 9F) [R. 711-24-Mar. 11, 2011, Psychiatric Review Technique (PRT)].   Dr. Eeltink opined the claimant has no limitations in activities of daily living, no limitations in social functioning, no limitations in concentration, persistence, and pace, and no episodes of decompensation of extended duration.   Dr. Eeltink concluded that the totality of evidence suggests the claimant's mental impairments are "non-severe." Although Dr. Eeltink's assessment is generally consistent with the overall evidence of record received at the hearing level and supports a finding of "not disabled," the undersigned finds the claimant somewhat more limited. Accordingly, the undersigned affords her opinions only some weight.   Detailed above and below, the undersigned has fully accounted for Dr. Eeltink's suggested limitations that are supported by the record in forming the claimant's residual functional capacity.[10]

State agency medical consultant Gary W. Buffone, Ph.D., is a non-examining, acceptable medical source and his opinions generally do not carry the same weight as examining or treating physicians (Exhibit 13F) [R. 783-96-May 18, 2011 (PRT)].   Dr. Buffone opined the claimant has mild limitations in activities of daily living, mild limitations in social functioning, mild limitations in concentration, persistence, and pace, and no episodes of decompensation of extended duration.   Dr. Buffone concluded that the totality of evidence suggests the claimant's mental impairments are "non-severe."   Dr. Buffone's assessment is consistent with overall evidence of record received at the hearing level and supports a finding of "not disabled."   Accordingly, the undersigned affords his opinions significant weight.   Detailed above and below, the undersigned has fully accounted for Dr. Buffone's suggested limitations that are supported by the record informing the claimant's residual functional capacity.[11]

State agency medical consultant Thomas Renny, D.O., is a non-examining, acceptable medical source in his opinions generally do not carry the same weight as examining or treating physicians (Exhibit 14F [R. 797-May 19, 2011 (affirming Mar. 11, 2011, assessment by Serena Collins)] compared to 10F [R. 725-32-Mar.

---

[10]   It appears Dr. Eeltink relied on Dr. Railey's consultative examination (CE) report of March 7, 2011, *see* R. 560-61, and Plaintiff's pre-hearing statements and noted that "[l]imitations are physical."   R. 723.   Dr. Eeltink's consultant's notes do not indicate she reviewed any medical records.   *Id.*

[11]   Dr. Buffone's consultant's notes, R. 795, indicate that he reviewed, in part, Dr. Railey's March 2011 report, R. 559-61; Dr. Nadeau's April 17, 2011, patient notes, R. 739; and a January 2011 pre-hearing phone statement from Plaintiff reported by Serena Collins, R. 215.   He derived a conclusion therefrom that Plaintiff's primary limitations are "physical in nature" due to migraines.   R. 795.   It does not appear Dr. Buffone reviewed other patient records from Dr. Nadeau or patient records from Dr. Smith.   *Id.*

11, 2011 (Ms. Collins', a single decision maker, Physical RFC Assessment)]).
Dr. Renny opined that the claimant can lift and/or carry 20 pounds occasionally,
10 pounds frequently, can stand and/or walk about 6 hours in an 8-hour workday
(with normal breaks), can sit (with normal breaks) for a total of about 6 hours in
an 8-hour workday, and has unlimited pushing and/or pulling other than as
shown for lift and/or carry.   Dr. Renny also opined that the claimant has no
postural limitations, no manipulative limitations, no visual limitations, no
communicative limitations, and no environmental limitations.[12]   Dr. Renny's
assessment is consistent with the evidence of record and supports a finding of
"not disabled."   Accordingly, the undersigned affords his opinions significant
weight.   Detailed above and below, the undersigned has fully accounted for
Dr. Renny's suggested limitations that are supported by the record informing the
claimant's residual functional capacity.

The Supplemental Mental Residual Functional Capacity Assessment by
Dr. Stephen Nadeau is given little weight because of the assessment's
inconsistency with the overall evidence of record received at the hearing level
(Exhibit 2F [R. 315-58-Feb. 28, 2008, to Mar. 2, 2008]).   The undersigned notes
that Dr. Nadeau's evaluation is not supported by the overall evidence of record
received at the hearing level and/or the longitudinal medical record.   The
undersigned also notes that the [sic] Dr. Nadeau did not have the benefit of
reviewing all the evidence presented at the hearing level when making his
findings.

R. 26-28.

As noted above, the ALJ referred to a Supplemental Mental Residual Functional

Capacity Assessment by Dr. Stephen Nadeau and cited to Exhibit 2F, R. 315-58.

R. 27.   Exhibit 2 includes patient records from John Hopkins Bayview Medical Center

from February 28, 2008, to March 2, 2008.   Doc. 8-1 at 3.   A review of Exhibit 2F does

---

   12    The ALJ refers to Dr. Renny's one sentence "case analysis," Exhibit 14F, and
Ms. Collins' assessment, Exhibit 10F.   R. 27.   Notwithstanding the ALJ's attribution of
these conclusions to Dr. Renny, Dr. Renny did not complete an independent
assessment.   R. 797.   Rather, he stated he "reviewed all the evidence in [the] file and
the assessment of 3/11/11" and affirmed that assessment "as written."   *Id.*   Dr. Renny
did not elaborate on the evidence he reviewed.   *Id.*   The March 11, 2011, physical
RFC assessment was performed by Ms. Collins and her qualifications are not noted.
R. 732.   Ms. Collins also reported the substance of a telephone conversation she had
with Plaintiff on January 20, 2011.   R. 215; *see supra* at n.11.

not reveal this supplemental assessment.   R. 315-58.   On June 28, 2011, Dr. Nadeau

opined in a Mental RFC Checklist, *see supra* at 23-24, in part, that Plaintiff's condition

would deteriorate under the stress of a job, with the increase of anxiety and depressive

symptoms.   R. 807.   No party refers to a supplemental assessment by Dr. Nadeau.

Docs. 16 and 17.

### C.  Evidence Before the Appeals Council

On November 14, 2012, Dr. Smith wrote to Plaintiff's attorney.   R. 5, 8-9, 13,

1178-80 (Exhibit 31F).   She explained that she was attempting to provide treatment for

Plaintiff's acute migraine episodes with a "migraine cocktail," but this "only provides

temporary relief and is not recommended for frequent and long-term use."   She noted

that, starting in 2008, she referred Plaintiff to multiple neurologists.   R. 1178.    She

further summarized Plaintiff's treatment with Dr. Nadeau, but opined that Plaintiff

"progressively developed many adverse side effects, including sleeping approximately

20 hours per day" on his treatment program.   She stated that Plaintiff was concerned,

and so Dr. Smith "became a strong advocate in favor of discontinuation of the opiate

treatment plan" even though "discontinuation of the medications would most likely

precipitate the worsening of her migraine severity and frequency."   R. 1179.   Dr. Smith

admitted, "[t]he result was, and remains, as I expected."   Terminating Dr. Nadeau's

treatment plan resulted in a "marked improvement" in her ability to groom herself, cope

with depression, sleep less, and undertake some personal activities and household

tasks.   Nevertheless, "the migraine severity and frequency did, in fact, worsen given

the absence of prior medicinal therapies."   Yet, Dr. Smith maintained that Dr. Nadeau's

treatment plan was "entirely unsafe for [Plaintiff] to continue the use of opiates, and that alternative treatment methods should be pursued."   *Id.*

Dr. Smith then listed eleven other alternative methods of treatment that had failed.   *Id.*   In addition, she noted that Plaintiff's most recent treatment with Dr. Arcos' interventional pain control methods had also failed.   She opined, "I believe the probability of [Plaintiff's] finding an effective and complete resolution for such severe, frequent migraines is unlikely at this point."   As a result, she opined that Plaintiff was "absolutely unable to engage in any scheduled work activity or even perform regular activities of daily living from 2008 to 2012 due to adverse side effects of consuming large doses of opiates."   R. 1180.   Furthermore, since those medications were discontinued, the "migraine severity and frequency, has remained constant or even worsened.   In turn, it remains my opinion that [Plaintiff's] condition would preclude her from performing even part-time employment."   *Id.*

The Appeals Council reviewed Dr. Smith's letter.   R. 5; *see supra* at 3.

### D.   Plaintiff's Hearing Testimony[13]

The hearing transcript notes that Plaintiff was represented "by an Attorney," although no attorney is mentioned by name. R. 38; *see supra* at n.1.   Plaintiff's attorney

---

[13]   The ALJ refers to Plaintiff's hearing testimony in his decision in conjunction with other evidence.   *See* R. 22-23, 25.

asked her several questions; the ALJ did not ask her any questions.   R. 39-47.   No vocational expert testified.

Plaintiff testified she could not work because she experiences "migraine on a daily basis."   R. 39.   She experiences "[e]xcruciating pain and vomiting" and she "end[s] up in bed the entire duration, whether it be for a couple [of] hours or several days."   *Id.*   At the time of the hearing, Plaintiff was "no longer taking narcotics, so the only option [she has] at this point is to take an Imitrex injection, which doesn't typically get rid of the migraine, it just makes it wane a little bit.   And then [her] only other medications are NSAIDs."   *Id.*   When the migraine hits, her pain on a scale of one to ten with ten being in emergency sort of pain, "is generally around a seven."   *Id.*   After she takes Imitrex, her pain level is "[a] six."   R. 40.

In the past, she took narcotic medication and her pain level would go down to "[p]robably a five."   *Id.*   She stopped taking narcotics because "[t]hey were having a profound negative impact on [her] both psychologically.   Physically [she] had become so sedentary that [she] was sleeping 22 hours a day," which have been the case for four years.   *Id.*   When she was taking narcotics, "[she] literally did nothing."   She would get up from bed for a brief time then go back to bed.   She "even went several days without showering."   R. 46.   During her narcotics use, her relationship with her family was "[v]ery severely damaged in fact"; "very limited."   *Id.*   Her husband described her as being "absent."   Her bedroom "became her cave."   R. 47.   She stopped taking narcotics on January 5, 2012.   R. 46.

She went through a treatment process and although she was not psychologically addicted to narcotics, her "dependency on them was so great that the physical withdrawals actually endangered [her] life and physicians determined that [she] needed to be placed in behavioral health services to be detoxed, to make the withdrawal symptoms more manageable."   R. 40-41.   She was taking the medication as prescribed by Dr. Nadeau at Shands who felt that she was incapable of working as Plaintiff described.   R. 41.   Plaintiff explained that she went to Dr. Nadeau "as a last-ditch effort."   *Id.*   She had already been to Mayo, John Hopkins, and saw other neurologists.   When she saw Dr. Nadeau, "he explained that [she] had been in status migrainosus for about 93 days, [she believed], and that narcotics were the last option the treatment.   So that's why he started it.   He put [her] on a very large dose, and [she] stayed on those doses for the four years he treated [her]."   *Id.*   The doses increased, but did not help her pain enough; they just made her more sedentary.   *Id.*

Plaintiff explained that her "depression is two-fold.   [She] went into surgical menopause due to a hysterectomy.   So that caused some of the depression, and then a great deal of it was caused by migraines, and really feeling no hope of ever finding a fix it."   R. 42.   She started to see Mr. Keith Ivy for these problems.   *Id.*   Her migraines did not benefit from this treatment.   He was more concerned about doing a workup of her childhood and relationship with her parents.   *Id.*   She no longer sees Mr. Ivey as she did not find it helpful.   *Id.*

Plaintiff stated she continues to have daily migraines and had one during the hearing.   *Id.*   She stated that if she were not the hearing, she "would be in bed."   *Id.*

Plaintiff took two Imitrex shots the morning of the hearing as she woke up with the

migraine 3:30 A.M.   She remained in bed, but awake.   R. 43.

When she has similar migraines, she stays in bed with "heavy drapes … pulled

over the windows.   It is completely silent, dark, cold.   And unfortunately [she] can't go

to sleep either because the pain is too intense."   *Id.*   She also experiences nausea

with her migraines and was nauseous at the hearing and had "thrown up three times."

*Id.*

Plaintiff stated that she has "nerve compression in [her] left elbow, which has

caused [her] left hand to go numb.   The entire time that [she] saw Dr. Nadeau [she]

kept mentioning that to him.   And his response each time is that it is migraine aura that

[she was] experiencing, but it never goes away."   R. 43-44.   Plaintiff stated that she

has been told by a neurologist that "it's an ulnar nerve compression" for which she

expected to have surgery, although she has had the condition for so long that any

"nerve rejuvenation only happens at one inch per month.   So he's not optimistic that it's

going to help [her] hand, it will simply prevent additional damage to [her] arm."   R. 44.

She is right-handed.   *Id.*

Plaintiff stated that she has difficulty with her neck and takes Robaxin which is a

daily muscle relaxer that does not make her sleepy.   She also takes Zanaflex at night in

order to relax her neck and shoulders.   R. 44.   Plaintiff stated that she has "some

degeneration of the joints in [her] neck" and some low back pain – arthritis.   *Id.*   She

just saw Dr. Patel, a rheumatologist, who "said she thinks the arthritis is moderately

severe in [her] knees" and Plaintiff receives cortisone injections every three months.   R.

45.   Plaintiff also has "moderate arthritis in both shoulders" so Dr. Patel, who can only give her two steroid injections every three months, alternates between her shoulder and knee.   *Id.*

Plaintiff described her daily activities.   R. 45-46.   She usually sleeps about eight hours a night.   During the day, she gets up and tries to eat breakfast, clean herself and the kitchen, but spends a great deal of the day in bed.   R. 45.   She gets a migraine every day, but that does not necessarily mean that it lasts all day.   She tries to take advantage of the time that her pain level is five or below, but knows how to "just nurse a headache when [she] get[s] that seven or above."   *Id.*   She reiterated that she is "in bed" when a migraine hits and is "[c]ompletely incapacitated."   R. 46.   Plaintiff stated that she cannot drive when she has a migraine.   *Id.*   She will call her husband to get the children or her father-in-law or her neighbor when she has a migraine.   She shops and does cooking when she feels well.   *Id.*

## V.   Legal Analysis

### 1.   Introduction

Plaintiff raises three issues for consideration: (1) the ALJ erred in finding Plaintiff's mental impairments non-severe at step two of the sequential evaluation process, doc. 16 at 19-22; (2) the ALJ erred in assessing Plaintiff's RFC and at step three because he did not properly address Plaintiff's migraines and related sleep disorder, doc. 16 at 22-28; and (3) the ALJ's credibility determination is not supported by substantial evidence, doc. 16 at 28-32.   Plaintiff also argues that remand for an award of benefits is merited.   Doc. 32 at 32-33.   In light of the recommendation to

reverse and remand this case on issue one, it is not necessary to address issues two and three.

### 2.   Substantial evidence does not support the ALJ's step two determination that Plaintiff's mental impairments are non-severe.

At step two, it is Plaintiff's burden to produce evidence of and prove that she has severe mental impairments that significantly limit her ability to perform basic mental work-related activities.   Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).   The issue is whether the claimant has shown that he or she has a condition that has more than "a minimal effect on her ability to: walk, stand, sit, lift, push, pull, reach, carry, or handle, etc."   Flynn v. Heckler, 768 F.2d 1273, 1275 (11th Cir. 1985) (relying on 20 C.F.R. § 404.1521).   To be considered "severe," a medical condition must constitute more than a "deviation from purely medical standards of bodily perfection or normality." McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986).   Further, a diagnosis alone is not a sufficient basis for a finding that an impairment is severe because "the 'severity' of a medically ascertained disability must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality."   Id. at 1547.   "[I]n order for an impairment to be non-severe, 'it [must be] a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.'"   Parker v. Bowen, 793 F.2d 1177, 1181 (11th Cir. 1986) (citing Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984)); Edwards v. Heckler, 736 F.2d 625, 630 (11th Cir. 1984); and Flynn, 768 F.2d at 1274.

On the other hand, "[s]tep two is a threshold inquiry.   It allows only claims based

on the most trivial impairments to be rejected.   The claimant's burden at step two is mild. . . .Claimant need show only that her impairment is not so slight and its effect is not so minimal."   McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir. 1986) (clarifying Brady).   It was been said that step two of the sequential analysis may do no more than screen out de minimus claims.   Stratton v. Bowen, 827 F.2d 1447, 1453 (11th Cir. 1987).   Nevertheless, an impairment is not severe if it does not significantly limit a claimant's mental ability to do basic work activities.   20 C.F.R. § 404.1521(a).   "Basic work activities" include: physical functions such as walking, standing, sitting, lifting, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting.   20 C.F.R. § 404.1521(b)(1)-(6).   If a claimant has none or mild limitations in activities of daily living, social functioning, and concentration, persistence or pace, and none in the area of episodes of decompensation, the claimant is generally considered to have no severe mental impairment unless the evidence otherwise indicates that there is more than a minimal limitation in the claimant's ability to do basic work.   20 C.F.R. § 404.1520a(d)(1).[14]

Mental impairments are evaluated based on how the claimant's mental impairment impacts four functional areas: "Activities of daily living; social functioning;

---

[14]   The ALJ is not required, however, to identify all of the impairments that should be considered severe.   *See* Heatly v. Comm'r of Soc. Sec., 382 F. App'x 823, 825 (11th Cir. 2010) (unpublished); *see also* Mariarz v. Sec'y of Health & Human Servs., 837 F.2d 240, 244 (6th Cir. 1987).

concentration, persistence, or pace; and episodes of decompensation."   20 C.F.R.

§ 404.1520a(c)(3).   If the degree of limitation in the first three functional areas is rated

as "none" or "mild," and "none" in the fourth area, the Commissioner generally

concludes the impairment is not severe.   20 C.F.R. § 404.1520a(d)(1).   The ALJ must

incorporate the results of this analysis into his findings and conclusions.   Moore, 405

F.3d at 1213-14; Cuthbert v. Astrue, 303 F. App'x 697, 699 (11th Cir. 2008)

(unpublished).   The ALJ provided an analysis of the evidence relating to these

functional areas.   R. 20-24.

At step two (Finding 3), the ALJ determined that Plaintiff had one severe

impairment: migraine headaches.   R. 20.   The ALJ considered whether several other

"medically determinable impairments," physical and mental, were severe, including

"mood disorder, anxiety disorder, not otherwise specified, bipolar disorder, and [PTSD]."

R. 21.   The ALJ determined that these impairments (and others) were non-severe

"because - even when considered in combination with other medically determinable

impairments discussed in this decision – they have had a minimal (if any) limiting effects

on the claimant's functioning."   Id.   The ALJ also considered these same impairments

and noted that "the claimant's symptoms have improved when compliant with

conservative treatment and the evidence of record does not support any significant

functional limitations resulting from the aforementioned non-severe impairments."   Id.

The ALJ then stated:

> The undersigned notes that December 2001, Victoria Smith, M. D., a treating
> physician, indicated that the claimant was doing better with respect to her
> depression and was no longer getting counseling (Exhibit 24F) [R. 965; see
> supra n.8].   The undersigned also notes that in July 2012, the claimant denied

experiencing depression and anxiety and otherwise indicated she did not have any mental problems (Exhibit 24F4) [R. 892, 1048 (Dr. Lee); *see supra* at 33]. The undersigned further notes that the MRI scans of the claimant's cervical spine from February 2012 were generally unremarkable and otherwise revealed no evidence of focal disc herniation, nerve root compression, canal stenosis, and/or cervical spinal cord compression and/or injury (Exhibit 27F5) [R. 1049].

The diagnosis, relevant history, medical evidence of record, opinions, and [RFC] assessment pertaining to the claimant's severe medical determinable impairment is discussed in Finding 5 below.   The above-specified medically determinable impairments have been fully considered, singly, and in combination with other impairments, in the undersigned assessment of the claimant's [RFC] (Finding 5).

R. 21 (Finding 3).

At step three (Finding 4), the ALJ determined whether Plaintiff had "an impairment or combination of impairments that [met] or medically [equaled] the severity of the listed impairments in 20 CFR Part 404, Subpart P, Appendix."   R. 21.   The ALJ "considered each of the claimant's impairments individually and in combination with all medically determinable impairments discussed in [the] decision" and gave "particular consideration to the claimant's physical and mental impairments under the Listing of Impairments, including but not limited to sections" 11 *et seq.* (neurological) and 12 *et seq.* (mental disorders).   R. 22.   The ALJ found "that the medical evidence of record, as discussed in Finding 4 below, does not document listing-level severity and no acceptable medical source has mentioned findings equivalent in severity to the criteria of any listed impairment.   In making this finding, the [ALJ] has evaluated the claimant's mood disorder, anxiety disorder not otherwise specified, bipolar disorder, and [PTSD] in accordance with the special technique described in 20 CFR 404.1520(a) and 416.920(a)."   *Id.*

The ALJ considered the four broad functional areas set out in the disability

regulations for evaluating mental disorders and concluded that Plaintiff had *mild* restrictions of daily living; *mild* difficulties in maintaining social functioning; *mild* difficulties in maintaining concentration, persistence, or pace; and *no* episodes of decompensation, each of extended duration.   R. 21-24.   The ALJ relied extensively on reports from Dr. Railey, a consultative examiner, and Dr. Buffone, a state agency non-examining consultant; and Plaintiff's pre-hearing and hearing statements.   R. 22-24. There is no mention of any examination and treatment notes from Plaintiff's treating physicians.   *Id.*

As noted above, the ALJ, at step two, refers to his discussion of the evidence in Finding 5, the ALJ's RFC determination, R. 24-28.   R. 21.   For the most part, the ALJ relies on Plaintiff's pre-hearing and hearing statements, R. 25; reports from Dr. Railey, a consultative psychological examiner, R. 26, Dr. Eeltink, a non-examining psychologist, R. 27, Dr. Buffone, a non-examining psychologist, *id.*, and Dr. Renny, a non-examining physician, *id.*   The ALJ refers to Plaintiff's treating physicians in passing:

> Review of the medical evidence reveals that between December 2001 and August 2012, licensed physicians diagnosed the claimant with migraine headaches, tension headaches, daily chronic headaches, and performed greater occipital nerve blocks and trigger point injections (Exhibits 1F; 2F; 3F; 5F; 8F; 11F; 12F; 17F; 18F; 19F; 20F; 22F; 23F; 24F; 25F; 26F; 27F; 29F; 30F).
>
> The undersigned notes that Linda White, NP, opined that the claimant's migraine headaches were likely due to medication overuse in February 2008 (Exhibit 2F). The undersigned also notes that the claimant reported that she was highly productive in the mornings and her migraine headaches were markedly improved in December 2008 (Exhibit 3F).   The undersigned further notes that in April 2010, MRI scans of the claimant's brain were generally unremarkable and otherwise revealed no abnormal findings and/or acute disease (Exhibit 4F).

R. 25-26.   The ALJ refers to Plaintiff's GAF scores ranging between 40 and 60 and

gave them "little weight."   R. 26; *see supra* at n.9.

The ALJ then provided his credibility findings:

Inconsistent reports and testimony from the claimant and the fact that the record contains observations of generally stable examination findings, with some improvement in condition when compliant with conservative treatment, detract from the credibility of the claimant's allegations as to her functional limitations and the severity the alleged symptoms.   While the above referenced inconsistencies may not have been the product of a conscious attempt to mislead on the part of the claimant, they nonetheless undermine the credibility of her allegations in reporting her activities of daily living and functional abilities. Accordingly, the undersigned finds the claimant's allegations are not entirely credible pursuant to Social Security Ruling 96-7p.

Pursuant to 20 CFR 416.927 and Social Security Rulings 96-6p and 96-2p, the finding above is supported by reports from treating and examining physicians, as documented in the medical evidence of record.   The undersigned has considered these medical source reports, along with opinions from a non-examining State agency consultants, in the undersigned evaluation of the claimant's functional limitations and weighed them above and below accordingly. The record also contains opinions from sources not considered "acceptable medical sources," which the undersigned has duly considered pursuant to Social Security Ruling 06-03p.

R. 26-27.   At this point, the ALJ refers to reports written by Drs. Eeltink, Buffone, and

Renny.   R. 27.   For the first time and toward the end of his RFC analysis, the ALJ

expressly refers to Dr. Nadeau, one of Plaintiff's treating physicians:

The Supplemental Mental Residual Functional Capacity Assessment of Dr. Stephen Nadeau is given little weight because of the assessment's inconsistency with the overall evidence of record received at the hearing level (Exhibit 2F).   The undersigned notes that Dr. Nadeau's evaluation is not supported by the overall evidence of record received at the hearing level and/or the longitudinal medical record.   The undersigned also notes that the [sic] Dr. Nadeau did not have the benefit of receiving all the evidence presented at the hearing level when making his findings.

R. 27-28.

The ALJ concluded his RFC determination:

> In sum, the above referenced functional capacity assessment is well supported by the weight of evidence.   After fully considering the objective medical evidence of record, the claimant's subjective complaints, and the treatment required for the claimant's conditions, the undersigned concludes the overwhelming evidence, in light of the undersigned assessment of the claimant's credibility, supports her ability [to] perform a full range of light work.

R. 28.[15]

As the finder of fact, the ALJ is charged with the duty to evaluate all of the medical opinions of the record resolving conflicts that might appear.   20 C.F.R. § 404.1527.   When considering medical opinions, the following factors apply for determining the weight to give to any medical opinion: (1) the frequency of examination and the length, nature, extent of the treatment relationship; (2) the evidence in support of the opinion, i.e., "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight" that opinion is given; (3) the opinion's consistency with the record as a whole; (4) whether the opinion is from a specialist and, if it is, it will be accorded greater weight; and (5) other relevant but unspecified factors.   20 C.F.R. § 404.1527(b) & (c).

The opinion of the claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary.   Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).   This is so because treating physicians

---

[15]   As part of the step four analysis, the ALJ determined that Plaintiff "is capable of performing past relevant work as an accountant," as actually performed, "[c]onsistent with the conclusion of Disability Determination Services upon reconsideration."   R. 28. In the alternative, the ALJ determined Plaintiff could perform "other jobs that exist in significant numbers in the national economy."   *Id.*   The ALJ did not identify any specific jobs that Plaintiff is capable of performing and did not have the benefit of an opinion from a vocational expert.   *Id.*

"are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."   20 C.F.R. § 404.1527(c)(2).   "This requires a relationship of both duration and frequency."   Doyal v. Barnhart, 331 F.3d 758, 762 (10th Cir. 2003).   "'The treating physician doctrine is based on the assumption that a medical professional *who has dealt with a claimant and his maladies over a long period of time* will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records.'   *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) (emphasis added)."   *Id.*

> As the Supreme Court recently observed, "the assumption that the opinions of a treating physician warrant greater credit that [sic] the opinions of [other experts] may make scant sense when, for example, the relationship between the claimant and the treating physician has been of short duration."   *Black & Decker Disability Plan v. Nord*, [538 U.S. 822, 832 (2003)].   Moreover, a longstanding treatment relationship provides some assurance that the opinion has been formed for purposes of treatment and not simply to facilitate the obtaining of benefits.
>
> A physician's opinion is therefore not entitled to controlling weight on the basis of a fleeting relationship, or merely because the claimant designates the physician as her treating source.   Absent an indication that an examining physician presented "the *only* medical evidence submitted pertaining to the relevant time period," the opinion of an examining physician who only saw the claimant once is not entitled to the sort of deferential treatment accorded to a treating physician's opinion.   *Reid v. Chater*, 71 F.3d 373, 374 (10th Cir. 1995) (emphasis added).

Doyal, 331 F.3d at 762-63.

The reasons for giving little weight to the opinion of the treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir.

1992), and must be clearly articulated.   Phillips, 357 F.3d at 1241.   "The Secretary

must specify what weight is given to a treating physician's opinion and any reason for

giving it no weight, and failure to do so is reversible error."   MacGregor, 786 F.2d at

1053.

The ALJ may discount a treating physician's opinion report regarding an inability

to work if it is unsupported by objective medical evidence and is wholly conclusory.

Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991).   Stated somewhat

differently, the ALJ may discount the treating physician's opinion if good cause exists to

do so.   Hillsman v. Bowen, 804 F. 2d 1179, 1181 (11th Cir. 1986).   Good cause may

be found when the opinion is "not bolstered by the evidence," the evidence "supports a

contrary finding," the opinion is "conclusory" or "so brief and conclusory that it lacks

persuasive weight," the opinion is "inconsistent with [the treating physician's own

medical records," the statement "contains no [supporting] clinical data or information,"

the opinion "is unsubstantiated by any clinical or laboratory findings," or the opinion "is

not accompanied by objective medical evidence."   Lewis, 125 F.3d at 1440; Edwards,

937 F.2d at 583 (citing Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987)).

Further, where a treating physician has merely made conclusory statements, the ALJ

may afford them such weight to the extent they are supported by clinical or laboratory

findings and are consistent with other evidence as to a claimant's impairments.

Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986).

At step two, the Plaintiff bears the burden, however slight, that her mental

impairments were severe.   Dr. Nadeau examined and treated Plaintiff for several years.

On this record, Dr. Nadeau provided a detailed longitudinal record of his examination, treatment, diagnoses, and overall assessment of Plaintiff's functional abilities over time.

At step two, the ALJ glossed over the medical evidence, including Dr. Nadeau's patient notes.   R. 20-21.   In fact, at step two, the ALJ devoted one paragraph expressly discussing patient notes.   R. 21.   The ALJ referred to a December 2011 patient from Dr. Smith when the note is derived from Dr. Nadeau's letter ("a summary of his findings and plan of care", R. 964) to Dr. Smith dated December 22, 2011.   R. 21, 965 (Exhibit 24F); *see supra* at n.8.   The ALJ then refers to two patient notes from Dr. Lee, from the Department of Neurosurgery in Tallahassee, Florida, who examined Plaintiff on one occasion at the request of Dr. Arcos for Plaintiff's "headache and left arm and hand tingling and weakness." R. 894, 1050.   Dr. Lee reviewed Plaintiff's systems and under "psych" noted that Plaintiff "[d]enies sense of great danger, anxiety, mental problems, depression, and none."   R. 21, 892, 1048 (Exhibit 24F4).

At step three (Finding 4) and as part of his RFC determination, the ALJ globally references in one paragraph the diagnoses (omitting any mention of any mental impairments) provided by Plaintiff's "licensed physicians" between December 2001 and August 2012.   R. 25.   The omission may be attributed to the ALJ's finding at step two that the Plaintiff's diagnosed mental impairments (mood disorder, anxiety disorder, NOS, bipolar disorder, and PTSD) were non-severe.   R. 21.   The ALJ does not expressly mention Dr. Nadeau, *but see supra* at n.8, until the ALJ refers to a Supplemental Mental RFC Assessment purportedly written by Dr. Nadeau and the ALJ

gave it "little weight because of the assessment's inconsistency with the overall evidence of record received at the hearing level (Exhibit 2F)."   R. 27.   The ALJ further noted that "Dr. Nadeau's evaluation is not supported by the overall evidence of record received at the hearing level and/or the longitudinal medical record" and that "Dr. Nadeau did not have the benefit of reviewing all the evidence presented at the hearing level when making his findings."   R. 27-28.

A review of Exhibit 2F does not reveal this supplemental assessment.   R. 315-58.   Rather, on June 28, 2011, Dr. Nadeau opined in a Mental RFC Checklist that Plaintiff would have an extreme limitation in performing at production levels in a work environment; moderate limitations in the ability to maintain attention and concentration for brief periods and tolerate customary work pressures; and none to mild limitations in other areas of social interaction, sustained concentration or persistence, and adaption. R. 806-07.   He opined that her condition would deteriorate under the stress of a job, with the increase of anxiety and depressive symptoms.   R. 807.   Dr. Nadeau also opined that Plaintiff's affective disorder met the criteria for Listing 12.04 (Affective Disorder) since March 11, 2008, due to the continuous management of migraine headache, depression, and sleep disorder.   R. 809-10 (Exhibit 16F).

The ALJ is not required to specifically refer to every piece of evidence in his decision.   *See* Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005).   This general proposition was recently reaffirmed by the Eleventh Circuit.   Parks v. Comm'r, Soc. Sec. Admin., No. 14-12154, slip op. at 11 (11th Cir. Apr. 2015) ("[T]here is no rigid requirement that the [administrative law judge] specifically refer to every piece of

evidence in his decision, so long as" our Court can conclude [that] the [administrative law judge] considered [the claimant's] medical condition as a whole."   (second and fifth alteration in original) (internal quotation marks and citation omitted) (quoting Mitchell v. Comm'r, Soc. Sec. Admin., 771 F.3d 780, 782 (11th Cir. 2014)).

Dr. Nadeau noted that Plaintiff had her ups and downs with depression and that she infrequently received counseling, which is consistent with the ALJ's findings. Contrary to the ALJ's findings, however, medical records document severe depression and occasional suicidal ideation, despite medication.   *See, e.g.*, R. 367, 420, 430, 439, 489–90, 561, 741, 935, 949.   The ALJ rejected Dr. Nadeau's opinion regarding Plaintiff's limitations resulting from anxiety and depression because it was "not supported by the overall evidence of record[.]"   R. 27.   Dr. Nadeau explained, however, that Plaintiff's headaches were "further complicated by major depressive disorder that has been quite difficult to treat" and contributed to her disability.   R. 741-42, 748.   He also opined that Plaintiff's condition would deteriorate under the stress of the job, with an increase of anxiety and depressive symptoms.   He also felt the combination of her mental and physical impairments was severe enough to equal the Listing 12.04 affective disorder listing criteria.   R. 806-10.

In March 2012, Plaintiff had discontinued use of long-acting narcotic medications, Dr. Nadeau explained that Plaintiff's pain was "insuperably wrapped up in her depression" and that depression was an "enormous amplifier of suffering."   Dr. Nadeau noted that Plaintiff "has been able to meet her husband's ultimatum and is both enjoying

a sense of triumph over her own courage and success and a resultant respite from her

depression, with a resultant marked decrease in her level of suffering."   Although

Dr. Nadeau thought this was "wonderful," he was concerned about the stability of her

situation, and considered Plaintiff to be "quite fragile."   He recommended she returned

to counseling cognitive behavioral therapist.   R. 975.

At step two, the ALJ referred to one patient note of December 2011 from

Dr. Nadeau, R. 965, albeit attributing the note to Dr. Smith.   R. 21.   The ALJ also

referred to one patient note from Dr. Lee dated July 2012, R. 1048, who saw Plaintiff

once as a referral and not specifically for depression.   *Id.*   The ALJ summarized his

step two determination:

> The diagnosis, relevant history, medical evidence of record, opinions, and [RFC]
> assessment pertaining to the claimant's severe medical determinable impairment
> is discussed in Finding 5 below.   The above-specified medically determinable
> impairments have been fully considered, singly, and in combination with other
> impairments, in the undersigned assessment of the claimant's [RFC] (Finding 5).

R. 21 (Finding 3).

For the most part, the ALJ relied on Plaintiff pre-hearing and hearing statements,

R. 25, reports from State agency non-examining consultants (Drs. Eeltink, Buffone, and

Renny, and Ms. Collins, a single decision maker) and one consultative examination by

Dr. Railey, R. 26-27, and his rejection of a Supplemental Mental RFC Assessment of

Dr. Nadeau that does not appear to exist in the record, R. 27, when he determined

Plaintiff had an RFC to perform a full range of light work (Finding 5).   R. 24.

Case law does not require the ALJ to recite all of the evidence reviewed.   The

ALJ's decision, specifically at step two and to the extent the ALJ relied on his RFC's

findings to support his step two determination, *see* R. 21, however, lacks a meaningful discussion of years of detailed, longitudinal patient notes by Plaintiff's treating physicians especially Dr. Nadeau.   Based on a review of the ALJ's decision in light of the entire record, this Court cannot determine if the ALJ considered Plaintiff's medical condition as a whole and particularly the impact of her depression and related mental disorders on her ability to function in the work place.   Mitchell, 771 F.3d at 782.   In other words, the ALJ did not properly explain his evaluation of the evidence.   The appropriate remedy is a remand for further consideration, not an award of benefits as suggested by Plaintiff.   Doc. 16 at 32-33.

On this record and in light of the ALJ's findings, substantial evidence does not support the ALJ's step two determination that Plaintiff's mental impairments are non-severe.   In light of this determination, it is not necessary to consider the remaining issues raised by Plaintiff.

## VI.  Conclusion

Considering the record as a whole, the findings of the Administrative Law Judge are not based upon substantial evidence in the record and he did not correctly follow the law.   Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's applications for Social Security benefits be **REVERSED** pursuant to sentence four of 42 U.S.C. § 405(g) and **REMANDED** for further proceedings.

**IN CHAMBERS** at Tallahassee, Florida, on May 4, 2015.

**s/ Charles A. Stampelos_____**
**CHARLES A. STAMPELOS**

**UNITED STATES MAGISTRATE JUDGE**

**<u>NOTICE TO THE PARTIES</u>**

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.   A party may respond to another party's objections within 14 days after being served with a copy thereof.   Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**